# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FIRST UNITED BANK & TRUST,    :
                     :
      Plaintiff            :       Civil Action No. 1:09-CV-00429
                     :
                     :
v.                    :       (Chief Judge Kane)
                     :
THE PNC FINANCIAL SERVICES   :
GROUP, INC., et al.         :
                     :
      Defendants       :

## MEMORANDUM

Before the Court are three separate motions to dismiss filed by Defendants Sterling

Financial Corporation ("Sterling")(Doc. No. 17), The PNC Financial Services Group, Inc.

("PNC") (Doc. No. 18), and Equipment Finance, LLC ("EFI") (Doc. No. 19).  The motions are

fully briefed and are ripe for disposition.  For the reasons that follow, the motions will be granted

in part and denied in part.

## I.    BACKGROUND

### A.  Factual Background

On March 14, 2007, Plaintiff First United Bank & Trust ("First United"), entered into a

Master Loan Assignment Agreement ("Master Agreement") with Defendant EFI for the purchase

of logging equipment loans in EFI's portfolio.  (Doc. No. 1 ¶ 18.)  EFI is a Pennsylvania limited

liability company that provides financing for forestry and land-clearing operations in the

softwood chip business.  (Id. ¶ 4.)  It is alleged that EFI acted as the alter ego, instrumentality,

and agent of Sterling in all the dealings between First United and EFI.  (Id. ¶¶ 13, 16.)  Sterling

owned 100% of EFI's stock, controlled EFI's management employees, and had access to EFI's

business records.  (Id. ¶ 14.)  Sterling, and EFI as its wholly owned subsidiary, merged with

Defendant PNC on or about April 4, 2008.  (Id. ¶ 6.)

In early 2007, Sterling and EFI contacted First United to offer part of EFI's equipment

loan portfolio for sale.  (Id. ¶ 8.)  Representatives from the companies met to discuss the sale,

and, in negotiations leading up to the master agreement, it is alleged that EFI and Sterling held

themselves out as experts in making these equipment loans to the logging industry.  (Id. ¶ 9.)

They represented to First United, *inter alia*, that the loans had extremely low delinquency rates,

had suffered no losses during recent years, and were secured by equipment collateral that was in

good condition.  (Id. ¶ 9.)  They also represented that the loans had passed two separate reviews

by the United States Office of the Comptroller of the Currency.  (Id. ¶ 12.)  These

representations "gave false assurances" and further "lulled and deceived" First United about the

true nature and quality of the equipment loans.  (Id.)  First United alleges that these

representations were part of a fraudulent scheme perpetrated by EFI and Sterling and calculated

to entice First United and other financial institutions to purchase equipment loans from EFI.

(Id.)  This scheme included: "subverting the putative internal controls of EFI; concealing credit

delinquencies; falsely claiming no losses on the Loan Portfolio; falsifying financial contracts and

related documents; and related actions and inactions in connection with EFI's equipment loan

business . . . ."  (Id.)

First United alleges that, as a result of EFI and Sterling's intentional and negligent

misrepresentations about the loans, it was induced to enter into the Master Agreement and

purchased ten equipment loans for $1,544,712.40. (Id. ¶¶ 17, 19-20.)  Under the Master

Agreement, EFI was to administer the loans and collect the proceeds for First United.  (Id. ¶ 19.)

First United noted that the loans were not performing up to expectations shortly after they were purchased. (Id. ¶ 21.) On or about April 20, 2007, First United received news from King T. Knox ("Knox"), President of Sterling Financial Corporation's Correspondent Services Group, that Sterling would be amending its financial statements from 2004, 2005, and 2006 due to irregularities in EFI's equipment financing contracts. (Id. ¶ 22.) Neither EFI nor Sterling had previously notified First United about any irregularities with EFI's loan portfolio, and despite the irregularities, Knox continued to represent that problems related to the irregularities did not affect the loans First United had purchased. (Id.) Subsequently, on May 24, 2007, Sterling released a press release announcing the existence of a fraudulent scheme orchestrated by high ranking EFI officers and employees resulting in the termination of five employees, including EFI's Chief Operating Officer and Executive Vice President. (Id. ¶ 23.) It is also alleged that EFI and Sterling improperly made payments on behalf of, or otherwise propped up the First United loans to conceal their substandard performance and the fraud. (Id. ¶ 24.) First United eventually learned that EFI had breached terms of the master agreement by withholding accurate information about administration of the equipment loans and the status of the collateral. (Id. ¶¶ 26-27.) Specifically, certain EFI equipment loans are alleged to be under-collateralized or not adequately supported by collateral, contrary to initial representations by EFI and Sterling. (Id. ¶ 29.)

As of the filing of the complaint in this action, two of the ten loans had been resolved, leaving eight loans outstanding that were purchased for $1,238,111,10. (Id. ¶ 20.)

**B. Procedural Background**

First United filed the complaint in this action on March 6, 2009, alleging seven causes of

action: Breach of Contract (Count I), Negligent Misrepresentation/Non-Disclosure (Count II), Intentional Misrepresentation/Non-Disclosure (Count III), Breach of Fiduciary Duty (Count IV), Conversion (Count V), Aiding and Abetting Breach of Fiduciary Duty (Count VI), and Concerted Tortious Conduct (Count VII). On each count, First United seeks damages in the amount of the purchase price of the eight remaining loans, $1,238,111.10, less principal payments received, plus accrued interested, late charges, and attorneys' fees. First United also seeks $10,000,000.00 in punitive damages on Counts III, IV, V, VI, and VII

### C. Standard of Review

In analyzing a complaint under Rule 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). The plaintiff still must provide more than a formulaic recitation of a claim's elements that amounts to mere labels and conclusions. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). Additionally, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level." Id. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515, F.3d at 234 (internal quotations and citations omitted).

## II. DISCUSSION

The Defendants have all separately moved to dismiss parts of the complaint. The Court will consider each motion as argued by the parties.

## A.  EFI

In its motion, Defendant EFI asserts that breach of contract is the only viable cause of action in the complaint and seeks dismissal of the remaining counts.  It advances several arguments in support of dismissal of the various counts, which will be considered in turn.

### 1.  Gist of the Action Doctrine

EFI argues that First United's claims for negligent misrepresentation, intentional misrepresentation, and breach of fiduciary duty must be dismissed because they violate Pennsylvania's "gist of the action" doctrine.[1]

Pennsylvania law precludes a plaintiff from bringing tort claims where the complained-of injury arises out of defendant's failure to fulfill its contractual obligations unless "the [tort] wrong ascribed to the defendant [is] the gist of the action with the contract being collateral." Phico Ins. Co. v. Presbyterian Med. Servs. Corp., 663 A.2d 753, 757 (Pa. Super. 1995); see also Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 581 (Pa. Super. 2003) ("a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts."); Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002) ("the [gist of the action] doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims[]" and "[a]s a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims.").  The Pennsylvania Superior Court has explained that the gist of the action doctrine bars tort claims: (1) arising solely from a contract between the

---

[1]  While the Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine, several courts have predicted it would.  See Williams v. Holton Group PLC, 93 Fed. App'x 384, 385 (3d Cir. 2004); Etoll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002); Air Products and Chemicals, Inc. v. Eaton Metal Products Co., 256 F. Supp. 2d 329 (E.D. Pa. 2003).

parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. Ct. 2005) (citations omitted).

The negligent misrepresentation, intentional misrepresentation, and breach of fiduciary duty claims are based on alleged misrepresentations made before and after the Master Agreement was executed. Given the nature of the gist of the action doctrine and the manner in which the parties have presented this issue in their briefs, the Court will evaluate these alleged misrepresentations separately.

### a. Pre-Agreement Misrepresentations

First United asserts that the gist of the action doctrine does not operate to bar their claims based on misrepresentations made before the Master Agreement was entered into by the parties. (Doc. No. 26 at 7.) In support of this contention, First United points out that these misrepresentations are in the nature of "fraudulent inducement," involving facts material to its decision to enter into the Master Agreement, and clearly invoke the social obligations against fraud rather than the obligations created under the contract. (Id.) EFI contends that these fraudulent inducement allegations are still barred because the Master Agreement explicitly includes the representations and covenants each party was entitled to rely upon and provides the terms of recovery to seek relief for breach. (Doc. No. 22 at 13-14.) EFI also argues that these three claims essentially duplicate the breach of contract claim in Count I. (Id.)

Courts have recognized that "fraud in the inducement of a contract would not necessarily be covered by the gist of the action doctrine because fraud to induce a person to enter into a

contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself."

Air Products and Chemicals, Inc. v. Eaton Metal Products Co., 256 F. Supp. 2d 329, 341 (E.D.

Pa. 2003) (quoting Etoll, 811 A.2d at 17).  Fraud in the inducement claims are therefore "much

more likely to present cases in which a social policy against the fraud, external to the contractual

obligations of the parties, exists."  Id.  There is not an absolute exception for all fraudulent

inducement claims, however.  For example, several district courts evaluating the gist of the

action doctrine have held that fraudulent inducement claims are still barred when the fraudulent

statement made during negotiations becomes the basis for a subsequently executed contractual

duty.  Bryan's Quality Plus, LLC v. Shaffer Builders, Inc., No. 07-CV-2311, 2008 WL 3523935,

*4 (E.D. Pa. 2008); see also Williams v. Holton Group PLC, 93 Fed. App'x 384, 386 (3d Cir.

2004).  Considering the gist of the action doctrine as outlined above, the Court finds the

approach adopted by these courts persuasive and will apply it to the present action.

After reviewing the Master Agreement and Plaintiff's complaint, the Court finds that the

allegations of fraudulent inducement are barred by the gist of the action doctrine.  The Master

Agreement explicitly set outs the "warranties, representations, and covenants" made by each

party in sections 2 and 3.  In pertinent part, EFI represented that:

> (f) [EFI] shall have no actual knowledge . . . of any facts impairing the validity of the Transaction Documents subject of any Specifications executed in connection herewith, or of any rights created thereby, the Equipment or Collateral described in such Transaction Documents or this Agreement; and
>
> (g) The payments due under the Transaction Documents subject of any Specifications executed in connection herewith shall be current in all respects, except as is disclosed to [First United] in writing under such Specification; and
>
> (h) [EFI] has no actual knowledge . . . regarding any material adverse

> credit information regarding the Obligor subject of any Specifications executed in connection herewith, except as shall be disclosed to [First United] in writing at the time of the execution of the applicable Specification.

(Doc. No. 22-2 § 2(f)-(h) (hereinafter "Master Agreement").)[2]  The Master Agreement also sets out EFI's loan administration duties in significant detail.  (<u>See</u> Master Agreement § 7(a)-(h).)  It is clear that these representations and duties detailed in the Master Agreement concern the same facts and circumstances that First United now alleges were misrepresented in order to induce it to enter the Master Agreement:

> EFI and Sterling intentionally misrepresented: the credit quality of their borrowers; the nature and quality of the collateral for the loans in the First United Portfolio; their loan servicing capabilities; and the historical loan delinquency rates and loan losses on the Loan Portfolio

(Doc. No. 1 ¶ 57; <u>see also</u> ¶¶ 45, 72, 74.)  Additionally, there is no doubt that these representations were meant to be enforceable under the Master Agreement, as it provides the means and type of recovery the damaged party can receive in the event of breach:

> [EFI] agrees to indemnify and save [First United] harmless from any actual losses, including attorney's fees but excluding incidental or consequential damages, reasonably incurred by [First United] as a result of [EFI's] breach of any representations, warranties, covenants, and agreements contained in this Assignment provided however, as to [EFI's] performance of its obligations as fiscal agent hereunder, [EFI] shall be liable to [First United] for only actual losses and attorneys fees arising out of [EFI's] gross negligence and/or willful misconduct with respect thereto."

(Master Agreement § 6(a).)

---

[2]  Though not attached to the complaint, the Court may consider the Master Agreement attached to the Defendant's motion to dismiss because its authenticity is not disputed and First United's claims are partly based on the document.  <u>See e.g.</u>, <u>Pension Benefit Guar. Corp. v. White Consol. Inds., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

It is clear the subject representations made during negotiations foreshadowed contractual duties and subsequently ripened into contractual provisions such that the duties allegedly breached were grounded in the contract itself. Indeed, First United admits that it specifically sought to protect itself by bargaining with EFI to incorporate the prior representations into the contract such that they became a contractual duty. (Doc. No. 26 at 9.) Under these circumstances, the Court finds that the gist of the action doctrine bars these claims in Counts II, III, and IV based on fraudulent inducement allegations.

Even assuming *arguendo* that some of the alleged pre-agreement misrepresentations would not be barred under the gist of the action doctrine, they would still be barred for other reasons. As both parties agree, the Master Agreement is fully integrated, representing the entire understanding of the parties with all prior negotiations merged into it. (Master Agreement § 9.) Further, First United itself represents in the Master Agreement that "it is a sophisticated institutional investor" and acknowledges that it did not rely on any representation by EFI other than those set forth in the agreement. (Master Agreement § 3(b) & (d).) As EFI argues, fraudulent inducement claims are typically not allowed to proceed in Pennsylvania if the contract at issue is fully integrated because of application of the parol evidence rule. See Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1300 (3d Cir. 1996). The Supreme Court of Pennsylvania has found "the parol evidence rule barred consideration of prior representations concerning matters covered in the written contract, even those alleged to have been made fraudulently, unless the representations were fraudulently *omitted from the contract*." Id.; see also HCB Contractors v. Liberty Place Hotel Assoc., 652 A.2d 1278 (Pa. 1995). The party alleging such pre-agreement representations must therefore also allege the representations were fraudulently or accidently

omitted from the integrated written contract, which First United does not appear to have done. HCB Contractors, 652 A.2d at 1279. In light of EFI's arguments and the cited authority, the Court is not persuaded that these alleged misrepresentations should be exempt from the parol evidence bar.[3]

### b. Post-Agreement Misrepresentations

The parties differently characterize the alleged misrepresentations made after the Master Agreement was executed. First United asserts that EFI's post-agreement misrepresentations were intended to "induce First United to retain the portfolio . . . ." (Doc. No. 26 at 10.) First United argues that determining whether such fraud is "collateral" to the contract is a fact-intensive inquiry that should not be determined at the motion to dismiss stage. (Id. at 13-14.) EFI characterizes the alleged misrepresentations as "fraud in the performance" that merely duplicate the allegations in the breach of contract claim. (Doc. No. 31 at 7.)

Typically claims of fraud that arise in the course of the parties' contractual relationship and that concern the performance of the contract are barred under the gist of the action doctrine because the fraud is intertwined with the breach of contract. Hart, 884 A.2d at 340; see also eToll, Inc., 811 A.2d at 20-21. In support of its argument, First United points to Owen J. Roberts School Dist. v. HTE Inc., in which the district court held it could not determine at the motion to dismiss stage whether the alleged post-agreement misrepresentations were collateral or intertwined with the contract at issue. No. 02-7830, 2003 WL 735098, *5-6 (E.D. Pa. 2003).

In addition to the representations, warranties, and covenants discussed above, the Master

---

[3] The Court also agrees with EFI that pre-agreement allegations could not be the basis of First United's breach of fiduciary duty claim because, as the complaint itself alleges, the Master Agreement created the relationship between these separate entities.

Agreement clearly sets out the bounds and responsibilities for the continuing relationship between EFI and First United after execution of the contract. (Master Agreement § 7) Under its terms, EFI was appointed First United's "fiscal agent and attorney-in-fact" to administer the assigned equipment loans. (Master Agreement § 7.) As fiscal agent, EFI was required, *inter alia*, to "confirm that the subject Customers have maintained, any and all property and liability insurance policies in connection with the Applicable Interests," and promptly notify First United if it had actual knowledge of an event of default by any of the borrowers. (Master Agreement § 7(a).) The parties also agreed on the limits of the fiscal agent duty and built in protections for EFI:

> [EFI] undertakes to perform as fiscal agent on behalf of [First United] such duties and only such duties as are specifically set forth herein and no implied covenants or obligations shall be read into this Agreement against [EFI]. In all events as fiscal agent pursuant to the terms of this Section, [EFI] is entitled to use its discretion in respect to exercising or refraining from exercising any rights, or taking or refraining from taking any action which may be vested in [EFI] . . . or which [EFI] may be entitled to take or assert under any Applicable Interests . . . and [EFI] shall not be liable to [First United] for any action taken or omitted to be taken by it hereunder or pursuant hereto, except for the failure to make available promptly . . . to [First United] such sums as are required to be remitted to Assignee pursuant to subpart (c) of this Section and except as otherwise provided herein regarding [EFI's] liability to [First United] for gross negligence and/or willful misconduct.

(Master Agreement § 7(e).)

It is clear that the duties detailed in the Master Agreement concern the same matters that First United alleges were misrepresented after they entered a contractual relationship with EFI, including: 1) failing to disclose accurate information about EFI's ongoing administration of the purchased loans (Doc. No. 1 ¶¶ 53, 60, 74); 2) concealing the actual poor performance of the

loans by various methods (Id. ¶¶ 21, 24, 28); and 3) withholding accurate information about the status of equipment that served as loan collateral. (Id. ¶ 27.) The Court finds that these misrepresentations involve performance of duties that were created and grounded in the Master Agreement and that are inextricably intertwined with it. The alleged acts of fraud are simply restatements of alleged breaches of the detailed provisions in the Master Agreement that governed the ongoing relationship of the parties. Additionally, the Court must reject First United's argument that it is premature to make these determinations. While it may be correct that gist of the action determinations are not always appropriate at the motion to dismiss stage, First United has not adequately explained why such a determination would be premature in the present case. Considering the above, the Court is not persuaded that additional factual development is necessary to conclude that the alleged fraud is inextricably intertwined with the breach of duties created by the Master Agreement.

Accordingly, the Court finds that the gist of First United's action against EFI sounds in contract. Because First United's tort claims against EFI in Counts II, III, and IV—Negligent Misrepresentation, Intentional Misrepresentation, and Breach of Fiduciary—are integrally related to and essentially duplicate the breach of contract claim, they are barred by the gist of the action doctrine and will be dismissed.

### 2. Rescission

EFI, along with the other Defendants, have challenged First United's request in each count of the complaint for rescission of the Master Agreement. The Defendants contend that rescission is not a proper remedy because the Master Agreement limits relief to actual damages and also because First United has not properly alleged the required elements of rescission in its

complaint. (See Doc. No. 22 at 29.) Over the course of three briefs in opposition, First United never responds to Defendants' arguments. After reviewing the arguments and authority cited by the Defendants, the Court agrees that rescission is not a proper remedy in this case. As such, First United's demand for rescission of the Master Agreement will be dismissed.[4]

## B. Sterling

First United has named Sterling in its claims for negligent and fraudulent misrepresentation, aiding and abetting EFI's breach of fiduciary duty, and concerted tortious conduct. It also asserts that EFI was the alter-ego or agent of Sterling.

### 1. Double Recovery

Sterling argues that First United cannot properly sue both Sterling and PNC in this action, as the complaint alleges (and it is admitted) that Sterling fully merged into PNC as of April 4, 2008, with PNC as the surviving entity. (Doc. No. 23 at 7.) Indeed, Pennsylvania law provides that, when companies merge, "[t]he surviving or new corporation shall thenceforth be responsible for all the liabilities of each of the corporations so merged or consolidated. 15 Pa. Con. Stat. Ann. § 1929(b). It also provides, however, that "any claim existing or action or proceeding pending by or against any of the corporations may be prosecuted to judgment as if the merger or consolidation had not taken place or the surviving or new corporation may be proceeded against or substituted *in its place*." Id. (emphasis added). Sterling reads this to mean that the claims can proceed either against Sterling or against PNC but not against both simultaneously. The sole argument in response offered by First United is that it is merely pursuing "consistent remedies" against the Defendants. (Doc. No. 27 at 5.)

---

[4] EFI has also challenged claims of conversion in Count V and concerted tortious conduct in Count VII. As explained in further detail below, the Court will dismiss Count VII and reserve ruling on Count V.

The Court must agree with Sterling's reading of the Pennsylvania statute. Upon examination of the complaint, it is clear that PNC is sued as successor in interest to Sterling throughout the complaint. (See Doc. No. 1 ¶¶ 54, 67, 92, 97.) The rationale of holding PNC liable for Sterling's conduct is that Sterling no longer exists and PNC, as the surviving entity, assumes responsibility for all Sterling's liabilities. The statute simplifies this process by either allowing any claim against Sterling to be pursued as if no merger or consolidation had taken place, or for PNC to be substituted. But, pursuing claims together against Sterling and PNC as the successor in interest is not contemplated by the statute, as it is functionally equivalent to allowing double recovery against PNC. Despite this, the claims are properly brought against one of these Defendants, so the Court will not adopt Sterling's proposed remedy of dismissing the entire complaint. Given the circumstances, the Court will dismiss without prejudice any claim brought against PNC as a successor in interest to Sterling. Of course, First United may seek to amend its complaint to substitute PNC for Sterling, as provided by 15 Pa. Con. Stat. Ann. § 1929(b).

### 2. Direct Liability

First United has alleged throughout the complaint that Sterling and EFI both made the misrepresentations that underlie the tort claims in this case. As such, though these claims will be dismissed against EFI, Plaintiff argues that it has asserted an independent basis for the claims against Sterling. (Doc. No. 27 at 14.) While Sterling recognizes that First United has alleged Sterling's direct participation in these torts (Doc. No. 23 at 8), they argue that the allegations fail to state a claim against Sterling.

#### a. Justifiable Reliance

14

Sterling argues that the claims for fraudulent and negligent misrepresentation fail because First United cannot allege justifiable reliance, a required element of both claims. (Doc. No. 23 at 8.) In support of this contention, Sterling points out that, according to the provisions in the integrated Master Agreement between EFI and First United, First United relied upon only the representations by EFI that are listed in the Master Agreement when purchasing the equipment loans. (Id. at 9-10.)

Justifiable reliance is typically a question of fact for the fact-finder to decide. Toy v. Metropolitan Life Ins. Co., 929 A.2d 186, 208 (Pa. 2007) (citing Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451, 455 (Pa. 1971). Here, there is no question that First United has alleged that they justifiably relied on the subject misrepresentations. (See e.g., Doc. No. 1 ¶ 64.) As Sterling has argued, however, in some circumstances involving fully integrated contracts, Pennsylvania courts have found that there is no justifiable reliance as a matter of law. See Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 439 (Pa. 2004). In Yocca, a case dealing with the Pittsburgh Steelers sale of "stadium builder licenses"—essentially a license granting the purchaser the right to buy annual season tickets—the Pennsylvania Supreme Court addressed a situation where the plaintiff-appellees alleged justifiable reliance on representations contained in a sales brochure for the licenses but not in the final, integrated, sales agreement. Id. at 426 The court held that, under the circumstances, the plaintiff-appellees could not allege justifiable reliance:

> [G]iven the Commonwealth's adoption of the parol evidence rule, Appellees simply cannot be said to have *justifiably* relied on any representations made by the Steelers before the parties entered into the SBL Agreement. Indeed, by signing the SBL Agreement, which contained an integration clause stating that the terms of the SBL Agreement superceded all of the parties' previous representations and

agreement, Appellees explicitly disclaimed reliance on any such representations.

Id. at 438.

There are several issues with Sterling's contention in the present case. Unlike in Yocca, Sterling is not a party to the Master Agreement, so First United is not necessarily attempting to allege justifiable reliance on representations made during contract negotiations that were subsequently merged into the Master Agreement. In the context of the Master Agreement, First United was negotiating with EFI, and only disclaims reliance on unlisted representations made by EFI, not Sterling: "[First United] acknowledges that [First United] has independently and without reliance upon any representation by [EFI] (except as expressly set forth herein), relied upon its own credit analysis and judgment to accept this Assignment . . . ." (Master Agreement § 3(b). Additionally, several of the alleged misrepresentations came after the execution of the Master Agreement, such as Sterling's President of Correspondent Services informing First United that no irregularities with EFI's equipment loans affected the loans in the First United portfolio. (Doc. No. 1 ¶ 22.) Accordingly, at this early stage of the case, the Court finds that First United has sufficiently alleged justifiable reliance on Sterling's misrepresentations and that the alleged reliance is not invalid as a matter of law.

**b. Economic Loss Doctrine**

Sterling contends that First United's negligent misrepresentation claim is barred by the economic loss doctrine because it is brought to recover losses that are purely economic in nature. (Doc. No. 23 at 11.) First United argues that Sterling is a supplier of information for a pecuniary interest and falls under the exception to the economic loss doctrine recognized by the Pennsylvania Supreme Court in Bilt-Rite Contractors, Inc. v. Architectural Studio, 866 A.2d 270

16

(Pa. 2005).  In response to this argument, Sterling argues that the complaint does not sufficiently allege that Sterling is "a supplier of information for pecuniary gain," as required by <u>Bilt-Rite</u>, and that First United is not proceeding on a Restatement § 552 negligent misrepresentation claim.  (Doc. No. 30 at 6.)

In Pennsylvania, the economic loss doctrine operates to foreclose tort causes of action for economic injury unattended by physical injury or damage to real or personal property.  <u>Adams v. Copper Beach Townhome Cmtys., L.P.</u>, 816 A.2d 301, 305 (Pa. Super. Ct. 2003).  There are exceptions to this rule, however.  In <u>Bilt-Rite</u>, the Pennsylvania Supreme Court adopted the Restatement (Second) of Torts § 552[5] as the law in Pennsylvania and also held that "to apply the economic loss doctrine in the context of a Section 552 claim would be nonsensical . . . ."  866 A.2d at 288.  The case involved a general contractor's negligent misrepresentation claim brought against an architect to recover for the contractor's reliance on the architect's inaccurate plans that caused significant cost overruns in construction of a building.  <u>Id.</u> at 272-73.  The court explained that a § 552 claim was merely a clarification of existing tort law in certain

---

[5] Restatement § 552, which is entitled "Information Negligently Supplied for the Guidance of Others," provides, in pertinent part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

circumstances:

> Accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information. In so doing, we emphasize that we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.

Id. at 287.

Based solely on the language quoted above, Sterling argues that a § 552 claim "is separate and distinct from the common law tort of negligent misrepresentation," and suggests that First United is proceeding on a "common law formulation of the tort, not pursuant to Section 552 of the Restatement." (Doc. No. 30 at 6.) The Court must reject this contention. First United has clearly alleged a claim of negligent misrepresentation in Count II, and while § 552 is not raised by name in the complaint, the Bilt-Rite court only described § 552's role as "clarifying the contours of the [negligent misrepresentation] tort as it applies to those in the business of providing information to others." Id. at 287. Here, First United has alleged that Sterling held themselves out as an expert in the logging field and provided material information about the quality and performance of the subject equipment loans to induce First United to purchase them. (Doc. No. 1 ¶¶ 9, 10, 45, 47.) First United further alleges that it reasonably relied on Sterling's expertise and advice in deciding to enter a contractual relationship with Defendant EFI and then to remain in that relationship after problems were discovered within EFI. (Id. ¶¶ 11, 22, 53.) Construing the complaint in the light most favorable to First United, the Court finds that the allegations are sufficient at this early stage of the case to state a negligent misrepresentation

claim that fits under the narrow exception to the economic loss rule announced in <u>Bilt-Rite</u>.

### c. Aiding and Abetting Breach of Fiduciary Duty

Sterling argues that First United's claim against Sterling for aiding and abetting EFI's alleged breach of fiduciary duty in Count IV should be dismissed if First United did not state a viable claim of breach of fiduciary duty against EFI.  (Doc. No. 23 at 12.)  First United essentially concedes this point.  (Doc. No. 27 at 13.)  Accordingly, because the Court has found that the breach of fiduciary duty claim against EFI will be dismissed, the claim against Sterling for aiding and abetting that breach of fiduciary duty will also be dismissed.

### d. Concerted Tortious Conduct

First United has brought a claim for concerted tortious conduct against both Sterling and EFI.  (Doc. No. 1 ¶¶ 93-97.)  First United alleges "EFI and Sterling collusively performed a tortious act in concert with each other and agreed to commit the intentional torts of Fraudulent Misrepresentation and Conversion . . . ."  (<u>Id.</u> ¶ 94.)  Both EFI and Sterling argue that the claim for concerted tortious conduct against them must be dismissed if the underlying tort claims are dismissed against either of them.  (<u>See</u> Doc. Nos. 22 at 27; 23 at 13.)  First United essentially concedes this point, relying on arguments made in support of upholding the underlying claims. (<u>See</u> Doc. Nos. 26 at 15; 27 at 13.)

Based on the allegations of the complaint, it appears the concerted tortious conduct tort at issue is based on Restatement (Second) of Torts § 876(a), which provides that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . does a tortious act in concert with the other or pursuant to a common design with him . . . ."  This theory has been adopted by the Pennsylvania Supreme Court.  <u>See</u> <u>Skipworth by Williams v.</u>

Lead Industries Ass'n, Inc., 690 A.2d 169 (Pa. 1997). The provision requires valid underlying tortious acts against the Defendants. See Daniel Boone Area School District v. Lehman Bros., Inc., 187 F. Supp. 2d. 400, 412 (W.D. Pa. 2002) ("The plain language of § 876(a) indicates that a concert of action claim will lie only if both persons who are alleged to have acted in concert each committed a tortious act. If one person did not commit a tortious act, then that person cannot have acted in concert with another person who did harm the plaintiff."); see also Friedman v. F.E. Myers Co., 706 F. Supp. 376, 382 (E.D. Pa. 1989).

Here, Plaintiffs concede that there can be no claim unless it has alleged viable tort claims against both Defendants. As discussed above, the Court has dismissed the fraud claim against EFI, so there can be no claim that EFI and Sterling acted in concert to commit this tort. See Guy Chemical Co., Inc. v. Romaco S.p.A., No. 3:2006-96, 2009 WL 840386, *17 (W.D. Pa. 2009) (dismissing concerted tortious action claim after finding that underlying fraud claims were barred by gist of the action and economic loss doctrine). Additionally, no claim for conversion is even brought against Sterling in the complaint. As such, the claim for concerted tortious conduct will be dismissed.

### 3. Indirect Liability

First United asserts in its complaint that Sterling is EFI's alter ego or agent. (Doc. No. 1 ¶¶ 13, 16.) Sterling challenges these assertions, arguing that the allegations in the complaint are insufficient under Twombly for the claims to survive a motion to dismiss.

### a. Alter Ego and Piercing the Corporate Veil

Pennsylvania generally recognizes that the corporate veil may be pierced "whenever it is necessary to avoid injustice." Rinck v. Rinck, 526 A.2d 1221, 1223 (Pa. Super. Ct. 1987).

However, there is a strong presumption in Pennsylvania against piercing the corporate veil. <u>See</u> <u>Lumax Indus., Inc. v. Aultman</u>, 669 A.2d 893, 895 (Pa. 1994) (quoting <u>Wedner v. Unemployment Board</u>, 296 A.2d 792, 794 (Pa. 1972)).  Although there is no definitive test for piercing the corporate veil under Pennsylvania law, courts are instructed to apply a totality-of-the-circumstances test when determining whether to impose individual liability on a shareholder.  <u>First Realvest, Inc. v. Avery Builders, Inc.</u>, 600 A.2d 601, 604 (Pa. Super. Ct. 1991).  The Third Circuit has held that the factors to be considered under Pennsylvania law with respect to the alter-ego theory include, but are not limited to: failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; siphoning funds from the corporation by dominant shareholders; nonfunctioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization.  <u>Eastern Minerals & Chemicals Co. v. Mahan</u>, 225 F.3d 330, 333 n.7 (3d Cir. 2000).  The Third Circuit observed that: 'Pennsylvania . . . does not allow recovery unless the party seeking to pierce the corporate veil on an alter ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham. . . . In other words . . . Pennsylvania . . . requires a threshold showing that the controlled corporation acted robot-or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons.'  <u>Eastern Minerals</u>, 225 F.3d at 334 (quoting <u>Culbreth v. Amosa (Pty) Ltd.</u>, 898 F.2d 13, 14-15 (3d Cir. 1990)).  Notably, the fact that a corporation's stock is owned entirely by one entity does not make a corporation any less valid. <u>See</u> <u>Lumax</u>, 669 A.2d at 895 (citing <u>College Watercolor Group, Inc. v. William H. Newbauer,</u>

<u>Inc.</u>, 360 A.2d 200, 207 (Pa. 1976)).

Here, the complaint is sufficient to allege an alter ego claim under Pennsylvania law. It is alleged that Sterling owned 100% of EFI's stock, and that Sterling senior management had access to EFI's business records. (Doc. No. 1 ¶ 14.) Sterling is also alleged to have controlled EFI's management employees and to have kept its own employees at EFI's offices to perform services interchangeably for EFI. (<u>Id.</u>) Additionally, during the period of 2004-2006, EFI provided between 36% and 41% of Sterling's net operating income. (<u>Id.</u> ¶ 15.) There are also other allegations in the complaint showing Sterling's close connection with EFI's affairs, particularly in connection with this transaction with First United. (<u>See</u> <u>id.</u> ¶¶ 22-23.) Given these allegations and reading the complaint in the light most favorable to the plaintiff, the Court is satisfied that First United has sufficiently alleged that EFI was the alter-ego of Sterling to survive under <u>Twombly</u>, even considering the high hurdle in piercing the corporate veil in Pennsylvania. Of course, Sterling can challenge these allegations again at summary judgment if First United is unable to support them in the record.

### b. Agency

The three basic elements of agency in Pennsylvania are: "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." <u>Basile v. H& R Block, Inc.</u>, 761 A.2d 1115, 1120 (Pa. 2000). Agency is typically a question of fact, and when asserting agency "one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agency existed." <u>B&L Asphalt Indus., Inc. v. Fusco</u>, 753 A.2d 264, 269 (Pa. Super. Ct. 2000).

Considering the allegations in the complaint, particularly those discussed above that relate to Sterling's control and participation in the alleged transactions and fraud, the Court finds that an agency relationship is sufficiently alleged to survive under <u>Twombly</u>. Sterling relies too heavily on an earlier decision by this Court in <u>Indianapolis Life Ins. Co. v. Hentz</u>, No. 1:06-cv-2152, 2009 WL 36454 (M.D. Pa. 2009), in which the Court found that the plaintiff had insufficiently alleged an agency relationship between two corporate entities. <u>Hentz</u> arose in a different context and under Delaware law. Additionally, reading it as a whole, the allegations in the present complaint are substantively different from those in <u>Hentz</u>, and are sufficient to raise a right to relief on these allegations above a speculative level.

### C. PNC

Because of the Court's earlier determinations, there are only two claims remaining against PNC. The first claim is for breach of contract in Count I, which is asserted against PNC solely as a successor in interest to EFI. (Doc. No. 1 ¶ 42.) First United has also asserted a claim for conversion in Count V directly against PNC and EFI. The conversion claim is premised on First United's demand that PNC, as alleged successor in interest to EFI, repurchase the subject equipment loans. (<u>Id.</u> ¶ 80.) When PNC refused, First United claims that the claim for conversion arose because "PNC's refusal to repurchase the First United Portfolio and its continued retention of the purchase money paid by First United for the First United Portfolio is without First United's consent and lawful justification." (<u>Id.</u> ¶¶ 81-83.)

PNC argues that these claims are invalid because EFI never merged into PNC. The complaint clearly alleges that EFI merged into PNC on the same date as Sterling. (See Doc. No. 1 ¶ 4.) Throughout the three motions to dismiss, however, the Defendants contend that PNC is

not EFI's corporate successor.  (<u>See e.g.</u>, Doc. No. 24 at 9.)  Rather, Defendants suggest that EFI remains a separate corporate entity and a wholly-owned subsidiary of PNC Bank, N.A., which is itself a separate legal entity from PNC.  (<u>Id.</u>)  In support of this contention, PNC has attached a signed certificate from the "Assistant Secretary of PNC Bank, National Association" to its motion to dismiss.  (Doc. No. 24-4.)

First United's response to the Defendants on this issue appears to acknowledge that there are problems with these claims.  For instance, First United asks that the Court grant leave to amend the conversion claim as "[t]he Count was drafted under the belief that PNC was a successor in interest of EFI."  (Doc. Nos. 26 at 15; 28 at 6.)  Despite this, First United does not appear to unequivocally concede that EFI has not merged into PNC, suggesting that it is only PNC's contention.  (Doc. No. 28 at 6.)  In considering a motion to dismiss, courts must consider only "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  <u>Pension Ben. Guaranty Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).  As mentioned above, a court may also consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.  <u>Id.</u>  PNC never directly addresses whether the Court can properly consider its exhibit contradicting the complaint on a motion to dismiss, and, after considering the authorities, the Court finds that considering PNC's certificate would be improper.  Given the circumstances, the Court will reserve ruling on PNC's motion.  First United will be directed to submit within ten days either a proper motion to amend the complaint, <u>see</u> M.D. Pa. L.R. 15.1, or

notice that it intends to stand by the complaint as filed.[6]

## III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

motions to dismiss.  An order consistent with this memorandum will follow.

---

[6] Of course, First United should consider that if it stands by the complaint as filed, asserting the same claim against EFI and PNC as successor in interest to EFI may be considered impermissible double recovery, as discussed above.  <u>See</u> 15 Pa. Con. Stat. Ann. § 1929(b)

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FIRST UNITED BANK & TRUST,** | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No. 1:09-CV-00429** |
| | : | |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **THE PNC FINANCIAL SERVICES** | : | |
| **GROUP, INC., et al.** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

**AND NOW**, this 21st day of October 2009, upon consideration of the Defendants'

Motions to Dismiss (Doc. Nos. 17, 18, 19) filed in the above-captioned matter, and for the

reasons set forth in the Court's memorandum opinion filed herewith, **IT IS HEREBY**

**ORDERED THAT:**

1.  Defendant EFI's Motion to Dismiss (Doc. No. 19) is **GRANTED IN
    PART** as follows:

    a.  Plaintiff's claims against EFI for Negligent
        Misrepresentation/Non-Disclosure (Count II), Intentional
        Misrepresentation/Non-Disclosure (Count III), and Breach of
        Fiduciary Duty (Count IV) are **DISMISSED**.

    b.  Plaintiff's demand for rescission is **DISMISSED**.

2.  Defendant Sterling's motion to dismiss (Doc. No. 17) is **GRANTED IN
    PART** as follows:

    a.  Plaintiff's claims against Sterling for Aiding and Abetting Breach
        of Fiduciary Duty (Count VI), and Concerted Tortious Conduct
        (Count VII) are **DISMISSED**.

    b.  Plaintiff's claims brought against PNC as a successor in interest to
        Sterling are **DISMISSED** without prejudice to substitute PNC as

the surviving corporation of the merger, as provided by 15 Pa. Con. Stat. Ann. § 1929(b).

      c.      The motion is otherwise **DENIED**.

    3.      The Court will reserve ruling on Defendant PNC's motion to dismiss (Doc. No. 18).

**IT IS FURTHER ORDERED THAT** Plaintiff is directed to submit within ten

(10) days of the date of this order either a proper motion to amend the complaint, <u>see</u>

M.D. Pa. L.R. 15.1, or notice that it intends to stand by the complaint as filed.

                        _s/ Yvette Kane_____
                        Yvette Kane, Chief Judge
                        United States District Court
                        Middle District of Pennsylvania

.